UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE PACHECO,

                           Plaintiff,

        -v-

NEW YORK PRESBYTERIAN HOSPITAL,

                           Defendant.

Case No. 02-CV-9438 (KMK)

OPINION AND ORDER

Appearances:

Aaron David Frishberg, Esq.
Stevens, Hinds, & White, P.C.
New York, New York
*Counsel for Plaintiff*

James Stuart Frank, Esq.
David Ellis Prager, Esq.
Sills Cummis Epstein & Gross, P.C.
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff, Jose Pacheco ("Plaintiff"), initiated this action on November 26, 2002, alleging

that Defendant, New York Presbyterian Hospital ("Defendant"or the "Hospital"), discriminated

against him and a class of Hispanic employees by maintaining an "English-only" policy in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"),

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), 42 U.S.C. § 1981a, and

New York State and New York City human rights laws ("NYSHRL" and "NYCHRL,"

respectively).

        The Hospital now moves for summary judgment.  For the reasons stated herein, the

Hospital's motion is granted.

## I.  Background

In opposing this motion, Plaintiff has neither provided a counter-statement of material facts as required under Rule 56.1(b) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"), nor contested any of the facts contained in Defendant's Rule 56.1 Statement.  Although Rule 56.1(c) provides that uncontested material facts in the moving party's statement are to be deemed admitted, in order to rely on such statements the Second Circuit requires district courts to confirm that the statements are adequately supported by citations to evidence in the record and to disregard those which are unsupported.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (noting that district court may not rely solely on the movant's Rule 56.1 Statement but "must be satisfied that citation to evidence in the record supports the assertion"); *Giannullo v. City of New York*, 322 F.3d 139, 140-43 (2d Cir. 2003) (finding that unsupported assertions in the defendant's Rule 56.1 Statement had to be disregarded and the record independently reviewed, even where the plaintiff had not controverted those assertions).  Accordingly, unless otherwise noted, a review of the record, including Defendant's Rule 56.1 Statement, shows that the following facts are both undisputed and adequately supported.[1]

---

[1]Plaintiff objects to the use of his testimony from the second day of his deposition (June 30, 2004), claiming that it was never presented to him for correction, pursuant to Federal Rule of Civil Procedure 30(e).  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 9.)  Plaintiff states that he purchased a transcript of the first day's deposition, but due to his limited resources he saw no need to spend the extra money to purchase the second day's transcript.  (*Id.*)

Under Rule 30(e), the deponent must request a copy of the transcript before completion of the deposition in order to have the opportunity to review and correct the transcript.  *See* Fed. R. Civ. P. 30(e).  Defendant asserts that Plaintiff failed to request a copy of his deposition.

Plaintiff, a United States citizen, was born and raised in Puerto Rico.  (4th Am. Compl. ("Compl.") ¶ 4.)  Plaintiff identifies himself as Hispanic by national origin, and is fully bilingual in English and Spanish.  (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 11.)  Plaintiff has worked for the Hospital since August 5, 1994.  (Compl. ¶ 12.)  In 2000, Plaintiff was employed as a Patient Representative in the Associates in Internal Medicine ("AIM") Clinic of the Hospital. (Def.'s 56.1 ¶ 2.)  On approximately May 8, 2000, Plaintiff sought and obtained a transfer within the Hospital to the position of Patient Representative within the Ambulatory Referral Registration Area ("ARRA"), a unit of the Hospital's Patient Financial Services Department, the registration desks of which are located on the first floor of the Hospital.  (*Id.* ¶¶ 2, 13.) Plaintiff's was a purely lateral transfer, without any change in pay, benefits, or bargaining unit seniority.  (*Id.* ¶ 6.)  When Plaintiff transferred to ARRA, he was subject to a probationary period, during which he was to be trained and closely supervised.  (*Id.* ¶ 19.)

While Plaintiff worked in the ARRA unit (between May 8 and July 24, 2000), he was directly supervised by Mohammed Hack, and also worked under the supervision of Patricia Votta, Manager of Patient Financial Services, Outpatient Registration.  (Aff. of Patricia Votta ("Votta Aff.") ¶¶ 1, 5, 11.)  Neither Hack nor Votta speaks Spanish.  (*Id.* ¶ 11.)  During the period that Plaintiff worked in the ARRA unit, several patients complained to Votta that they

---

(Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") 14 n.14.)  Plaintiff does not contest this fact and has not produced any sworn statement or document indicating he requested a copy of his deposition.  Nor does Plaintiff challenge any of his statements at the second day of his deposition.  The failure of a party to request a copy of his own deposition transcript precludes his right to make changes to his transcript.  *See Blackthorne v. Posner*, 883 F. Supp. 1443, 1454 n.16 (D. Or. 1995) (finding that plaintiff had no right to make changes to the transcript where he produced no certificate indicating that he requested the opportunity to review the deposition before it was completed).  Therefore, Plaintiff's objection is denied.

believed they were being talked about or ridiculed by ARRA employees who were speaking about them in a language other than English and were laughing at them.  (Votta Aff. ¶ 8.)  Plaintiff was warned by Votta on three occasions, that while he was in the vicinity of patients at the ARRA, he was to refrain from speaking in a language other than English in the course of performing his responsibilities.  (Def.'s 56.1 ¶¶ 8, 12.)  The exception to this request was that Plaintiff was instructed (without objection) on multiple occasions by Votta and other supervisors, that he could, and should assist Spanish-speaking patients by talking to them in Spanish.  (Dep. of Jose Pacheco ("Pacheco Dep.") 262.)  Moreover, in the approximately ten weeks Plaintiff worked in the ARRA unit, he was never prohibited from speaking Spanish while not on-duty.  (*Id.* 175.)  Over half the employees and one supervisor in the ARRA unit are of Hispanic descent.  (Def.'s 56.1 ¶ 37; Pacheco Dep. 66.)  There is no evidence that any other ARRA employee complained about Votta or any other supervisor limiting their ability to speak Spanish while performing their jobs.  (Def.'s 56.1 ¶ 38.)  Further, Plaintiff acknowledges that no disparaging remarks were directed at his national origin by any Hospital representative while he was employed in the ARRA unit.  (Def.'s 56.1 ¶ 7; Pacheco Dep. 152-53.)

Plaintiff objected to Votta about her request that he speak only English while performing his job duties, and he alleges that in response to his complaint, Votta retaliated against him by varying his job duties and assignments.  (Compl. ¶ 21.)  In particular, Plaintiff claims that when he began working in the ARRA unit, his hours were 8:00 a.m. to 4:00 p.m. and that a week after he questioned Votta's request to speak English, Votta changed his hours to 8:30 a.m. to 4:30 p.m.  (*Id.* ¶¶ 22-23.)  The next week, Plaintiff claims, Votta again changed Plaintiff's hours to 9:30 a.m. to 5:30 p.m.  (*Id.* ¶ 24.)  Plaintiff alleges that the changes to his schedule disrupted his

home life by interfering with his ability to fulfill his parental responsibilities.  (*Id.* ¶ 26.)
Plaintiff further alleges that during this time period, Votta retaliated against him by telling him
that she intended to assign him to weekend work, although there is no evidence that Plaintiff
ever was assigned to work on weekends.  (*Id.* ¶ 25; Def.'s 56.1 ¶ 32.)  Finally, Plaintiff alleges
that Votta retaliated against him by assigning him a task requiring over two and a half-hours to
complete, only fifteen minutes before he was scheduled to leave for the day, and that Votta
unfavorably compared his productivity to that of a more senior co-worker.  (Compl. ¶¶ 28-29.)

 During the period Plaintiff was employed in the ARRA unit, he never received a written
warning, suspension, negative written evaluation, demotion, or written disciplinary action.
(Def.'s 56.1 ¶ 9.)  Plaintiff's job description in the ARRA unit detailed that his position required
flexible days and hours.  (*Id.* ¶ 29.)  In fact, the ARRA was open and staffed seven days a week,
and ARRA employees were expected to work variable hours and weekends.  (*Id.* ¶¶ 30-31; Votta
Aff. ¶¶ 12-13.)

 On approximately June 9, 2000, one month after transferring to the ARRA unit, Plaintiff
made an oral complaint to Gregory Rivera, a Hospital Human Resources employee, about
Votta's request that he speak only English while working.  (Compl. ¶ 33.)  Rivera assured
Plaintiff that the Hospital did not have an English-only policy.  (*Id.* ¶ 34.)  Approximately one
week later, Plaintiff again complained to Rivera about Votta's request that he speak only English
while performing his job responsibilities, and was told by Rivera to make a written complaint to
the Hospital's Human Resources Department.  (*Id.* ¶ 35.)  Plaintiff submitted a written complaint
to the Hospital's Human Resources Department on June 23, 2000.  (*Id.* ¶ 36.)  Approximately
one week later, Jeanette Hicks, Director of the Hospital's Human Resources Department, met

with Plaintiff to discuss his complaint.  (*Id.* ¶ 37.)  According to Plaintiff, Hicks took no action in response to his complaint following this meeting.  (*Id.*)

On approximately July 24, 2000, before Plaintiff completed his probationary period in the ARRA, Plaintiff applied for, and was granted, a transfer back to his prior position in the AIM clinic where he received the same salary, benefits, and bargaining unit seniority that he had in the ARRA unit.  (Def.'s 56.1 ¶¶ 3, 6.)  Plaintiff alleges that he was compelled to request this voluntary transfer in order to avoid having Votta ultimately reject his permanent transfer to the ARRA unit, although the record is devoid of any evidence supporting this concern.  (Compl. ¶ 39.)

Plaintiff alleges that his transfer back to the AIM clinic was detrimental to his candidacy for positions in other Hospital departments, and that he was further hampered in winning promotions because he lacked the experience he would have received in the ARRA unit. (Compl. ¶¶ 41-42.)  Plaintiff does not specify which promotions he was denied, the reasons for the denial of any such promotions, or the qualifications of those who received the unspecified promotions.  In any event, it is undisputed that approximately three months after transferring back to his position in the AIM clinic, Plaintiff applied for, and received a promotion with a salary raise of seventeen percent.  (Def.'s 56.1 ¶ 23.)  Subsequently, Plaintiff received a second promotion, and as of September 2004, earned close to double what he earned while he was at the ARRA unit.  (Def.'s 56.1 ¶ 24.)

## II.  Discussion

### A.  Summary Judgment Standard

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005); *see also Giannullo*, 322 F.3d at 140 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted."  *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir. 2003)).

However, Fed. R. Civ. P. 56(e) itself provides that the adverse party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."

Thus, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005) ("The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment." (internal quotation marks omitted)).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (noting that when deciding a motion for summary judgment, a district court should only consider evidence that would be admissible at trial).

"[I]n a discrimination case additional considerations should be taken into account.  A trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue.  Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citations omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting

the caution with which the Second Circuit reviews the grant of summary judgment in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions," but stating that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact" (internal quotation marks omitted)).  Although it is difficult for courts to ascertain discriminatory intent, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  And, although district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, *see Gallo*, 22 F.3d at 1224, courts are not to "'treat discrimination differently from other ultimate questions of fact,'" *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).[2]

_____

[2]Plaintiff contends that Defendant's Motion for Summary Judgment is precluded by Judge Hellerstein's denial of Defendant's Motion to Dismiss.  Plaintiff argues that "the doctrine of law of the case" bars Defendant from re-raising the identical arguments in its Motion to Dismiss.  (Pl.'s Mem. 1-2.)  A "ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint."  10A Wright, Miller & Kane, Federal Practice and Procedure § 2713, at 233 (3d ed. 1998 & Supp. 2008); *see also Hamilton v. Town of Hamden*, No. 08-CV-164, 2008 WL 4999301, at *2-3 (D. Conn. Nov. 19, 2008) (noting that "[i]n ruling on a 12(b)(6) motion to dismiss, the Court may consider only the

B.  Title VII Claims

Plaintiff claims that the Hospital discriminated against him on the basis of his national

origin, in violation of Title VII.  Title VII provides, in pertinent part, that it is an unlawful

employment practice for an employer "to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-2(a).  Plaintiff's Complaint breaks down his Title VII

claims as involving allegations of disparate treatment, disparate impact, hostile work

environment, and retaliation.  The Court will address each claim in turn, but, before doing so, it

is important to note that each of these categories of allegedly unlawful discrimination is largely

based on Defendant's limited English-only language practice in the ARRA unit, and/or

---

allegations made in the complaint, documents attached to the complaint, documents incorporated
into the complaint by reference, and any facts of which judicial notice may be taken" and
excluding evidence attached to the parties' memoranda regarding the defendants' motion to
dismiss because "such evidence is more appropriately reviewed upon motion for summary
judgment"); *Sobek v. Quattrochi*, No. 03-CV-10219, 2004 WL 2809989, at *6 (S.D.N.Y. Dec. 8,
2004) (holding that allegations not contained in the complaint may not be considered in Rule
12(b)(6) motions, which are addressed solely to the sufficiency of the complaint).  Here,
Defendant's Motion for Summary Judgment clearly relies on matters outside of the pleadings,
such as depositions, admissions and affidavits, that Judge Hellerstein could not have considered
in ruling on Defendant's Motion to Dismiss, thereby making the "doctrine of law of the case"
inapplicable and the Motion for Summary Judgment ripe for the Court's consideration.  This is
particularly true in a case like this one, where Plaintiff ultimately could not substantiate some of
the allegations set forth in his Complaint.  *See Beckman v. Walter Kidde & Co.*, 316 F. Supp.
1321, 1325 (S.D.N.Y. 1970) ("The unembellished allegation of conspiracy, unsupported by any
particulars disclosing a triable issue which can be called genuine, although sufficient to stand as
a pleading, is insufficient to withstand a motion for summary judgment – especially after an
opportunity has been given to offer details."), *aff'd*, 451 F.2d 593 (2d Cir. 1971); *accord
Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794, 797 (7th Cir. 1961) (noting that the "law of the
case" doctrine did not prevent one district judge from granting summary judgment in a case
where another district judge denied motion to dismiss).

Defendant's claimed retaliation against Plaintiff for complaining about that policy. There is not, for example, any claim that Defendant discriminated against Plaintiff for any other reason related to his national origin or ethnicity, or that any of Defendant's employees made actionable comments to or about Plaintiff. Instead, the thrust of Plaintiff's claim is that he was barred from speaking Spanish at certain times while in the ARRA unit, and that Defendant retaliated against him when he challenged Defendant's language practices in the ARRA unit.

### 1. Disparate Treatment

The first component of Plaintiff's Title VII claim is that Defendant's limited English-only practice constituted disparate treatment of Plaintiff because of his race and national origin. Indeed, as noted, Title VII bars employers from discriminating against an employee because of that employee's race, color, religion, gender, or national origin. *See Gomez-Perez v. Potter*, 128 S. Ct. 1931, 1940 (2008) (noting that Title VII contains "a broad prohibition of 'discrimination,' rather than a list of specific prohibited practices," all based on "race, color, religion, sex, or national origin"). To prevail on such a claim in the absence of direct evidence of discrimination, a plaintiff usually must satisfy the *McDonnell Douglas* three-part burden-shifting test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[3]

Under this test, Plaintiff must first establish a prima facie case of discrimination by showing four elements: (1) that he is a member of a protected class; (2) that he is qualified for his position; (3) that he suffered an adverse employment action; and (4) that the circumstances

---

[3]"Where there is direct evidence that race was the motivating factor, 'the *McDonnell Douglas* search for a motive is unnecessary and therefore inapplicable.'" *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 333 (S.D.N.Y. 1999) (quoting *Johnson v. State of New York*, 49 F.3d 75, 79 (2d Cir. 1995)).

give rise to an inference of discrimination.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42

(2d Cir. 2000); *see also Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005)

(applying the same test); *James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000)

(same); *Watson v. Paulson*, 578 F. Supp. 2d 554, 562 (S.D.N.Y. 2008) (same); *Collins v. Cohen

Pontani Lieberman & Pavane*, No. 04-CV-8983, 2008 WL 2971668, at *7 (S.D.N.Y. July 31,

2008) (same); *Boise v. New York Univ.*, No. 03-CV-5862, 2005 WL 2899853, at *3 (S.D.N.Y.

Nov. 3, 2005) (same).[4]  If Plaintiff establishes a prima facie case of discrimination – a minimal

burden – a presumption of discrimination arises.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 506 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also

Reddy v. Salvation Army*, No. 06-CV-5176, 2008 WL 2811828, at *8 (S.D.N.Y. July 21, 2008)

(noting that plaintiff's burden of establishing a prima facie case of discrimination is minimal).

The burden of production (but not persuasion) then shifts to Defendant to articulate a legitimate,

nondiscriminatory reason for its decision.  *See Burdine*, 450 U.S. at 254; *see also Bd. of Trs. of

Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978).  Defendant's burden at this stage "is not a

demanding one" as the employer "need only offer . . . an explanation for the employment

decision."  *Bickerstaff*, 196 F.3d at 446.  Once Defendant has met its burden of production, the

presumption of discrimination "drops out of the picture."  *See Boise*, 2005 WL 2899853, at *3

(citing *St. Mary's Honor Ctr.*, 509 U.S. at 510-11).

---

[4]Where a plaintiff alleges intentional discrimination, the legal analysis of the claims
under Title VII and the NYSHRL and NYCHRL are essentially identical.  *See Dawson*, 398 F.3d
at 217 (stating that *McDonnell Douglas* analysis applies to NYSHRL and NYCHRL claims);
*Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) ("New York courts require the
same standard of proof for claims brought under the [NYSHRL] as for those brought under Title
VII . . . .").

To withstand summary judgment, Plaintiff must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.*; *see also Weinstock*, 224 F.3d at 42.[5]  To do so, Plaintiff must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Weinstock*, 224 F.3d at 42 (internal quotation marks and alterations omitted).  In sum, once an employer gives an explanation for the action taken and the plaintiff attempts to refute it, the Court's responsibility is to "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Eschewing the case-by-case analysis typical of any Title VII action, the Parties here have spilled much ink abstractly debating the merits of English-only policies, and the EEOC's position on such policies.  Plaintiff, for example, asserts that the "Equal Employment Opportunity Commission has made clear that, absent a business necessity, 'English Only' policies in the workplace are national origin discrimination," and "[t]his position is in direct contradiction to the Defendant's position, which asserts that the policy of 'English Only' is *per se* not national origin discrimination."  (Pl.'s Mem. 3.)  Plaintiff also cites two decisions, which Plaintiff claims Defendant "deliberately sidestepped in its attempt to portray the law as 'well

---

[5]Notwithstanding the burden-shifting framework, the Supreme Court has made clear that the "ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253; *see also St. Mary's Honor Ctr.*, 509 U.S. at 511.

13

established,'" both of which hold that English-only policies may, in certain circumstances, contravene Title VII.  (*Id.* (citing *EEOC v. Premier Operator Servs., Inc.*, 113 F. Supp. 2d 1066, 1073 (N.D. Tex. 2000) and *EEOC v. Synchro-Start Prods. Inc.*, 29 F. Supp. 2d 911, 914-15 (N.D. Ill. 1999)).)  Following the supposition that English-only policies are inherently suspect under Title VII, Plaintiff alleges that his superiors' requirement that he not speak Spanish while working in the ARRA unit is a form of disparate treatment of persons of Hispanic national origin, including Plaintiff, compared, for example, to persons of "white-Anglo national origin." (Compl. ¶¶ 44, 55.)

In response, Defendant strenuously argues that Plaintiff has not made out a prima facie case because English-only practices do not on their face discriminate against employees on the basis of race, ethnic origin, or any other classification protected by Title VII.  At most, Defendant argues, such a practice involves a distinction based on language only and therefore is not contrary to Title VII.  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 9; Def.'s Reply 5.)

"As part of a disparate treatment claim," Plaintiff "must establish that [Defendant] acted with the intent to discriminate" on the basis of race, ethnic origin, gender, or religion.  *Hayden v. County of Nassau*, 180 F.3d 42, 52 (2d Cir. 1999).  As Defendant notes, many courts, including the Second Circuit, have recognized that Title VII does not expressly identify language as a protected class.  *See Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) (stating that "[l]anguage, by itself, does not identify members of a suspect class"); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) (noting that Title VII "does not protect against discrimination on the basis of language"); *Becances v. Prestige Decorating &*

14

*Wallcovering, Inc.*, No. 05-CV-4485, 2006 WL 963877, at *2 (S.D.N.Y. Apr. 13, 2006) (holding

that "non-English speakers . . . are not a protected class under Title VII"); *Velasquez v.*

*Goldwater Mem'l Hosp.*, 88 F. Supp. 2d 257, 262 (S.D.N.Y. 2000) (noting that termination from

employment for failure to comply with English-only policy did not establish Title VII

discrimination claim); *Long v. First Union Corp*., 894 F. Supp. 933, 941 (E.D. Va. 1995), *aff'd*,

86 F.3d 1151 (4th Cir. 1996) ("There is nothing in Title VII which protects or provides that an

employee has a right to speak his or her native tongue while on the job.").

However, the Supreme Court has observed that "[j]ust as shared language can serve to

foster community, language differences can be a source of division." *Hernandez v. New York*,

500 U.S. 352, 371 (1991). As the Supreme Court has put it, language "elicits a response from

others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn,"

which "all too often result from or initiate racial hostility." *Id.* Thus, for example, the Supreme

Court has suggested that the striking of potential jurors on the basis of language, could, in certain

circumstances, be a "pretext for racial discrimination." *Id.* at 371-72; *accord Garcia v. Gloor*,

618 F.2d 264, 270 (5th Cir. 1980) (noting that "[l]anguage may be used as a covert basis for

national origin discrimination"). Consistent with this notion, courts have recognized that an

employer's English-only policy can, in certain circumstances, support a Title VII claim of racial

discrimination. *See, e.g.*, *Maldonado v. City of Altus*, 433 F.3d 1294, 1304 (10th Cir. 2006)

(noting that "English-only policies are not always permissible; each case turns on its facts"),

*overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006);

*Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993) (refusing to "foreclose the

prospect that in some circumstances English-only rules can exacerbate existing tensions, or,

when combined with other discriminatory behavior, contribute to an overall environment of discrimination"); *Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 236 (N.D.N.Y. 1999) ("A speak-English instruction may form the basis for an inference of national origin discrimination.").

Critical to evaluating the propriety of a language-restriction policy under a disparate treatment theory, as in any such employment discrimination case, is whether the employer's practices reflect an intent to discriminate on the basis of the classifications protected by Title VII, including race and national origin.  In conducting this analysis, the courts consider, among other facts, whether there is evidence that the employer, in addition to adopting an English-only policy, has exhibited other forms of racial or ethnic hostility.  *See, e.g.*, *Spun Steak*, 998 F.2d at 1489 (noting that English-only policies in conjunction with other discriminatory conduct can "contribute[] to an overall environment of discrimination"); *Brewster*, 447 F. Supp. 2d at 351 (holding that there was sufficient evidence of discrimination where employer made comments, such as, "Speak English.  Go back to your own country if you want to speak Spanish.  You're in our country."); *Velasquez*, 88 F. Supp. 2d at 262-63 (noting that a "no-Spanish" policy "could be used to disguise a discriminatory motive").  Courts also have distinguished between various types of language-restriction polices, being more forgiving of those that apply only to work-related communication and to bilingual employees.  *See, e.g.*, *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170-71 (10th Cir. 2007) (upholding policy prohibiting employees from speaking Spanish while on the job and during job-related discussions, but permitting Spanish conversations during breaks or during non-job related discussions); *Maldonado*, 433 F.3d at 1307-08 (suggesting that an English-only policy, if applied at all times to all employees regardless of activity, could be discriminatory); *Gloor*, 618 F.2d at 270 (noting that "[t]o a

16

person who speaks only one tongue or to a person who has difficulty using another language than the one spoken in his home, language might well be an immutable characteristic like skin color, sex or place of birth. However, the language a person who is multi-lingual elects to speak at a particular time is by definition a matter of choice").

Thus, the strength of Plaintiff's case is not evaluated on a broad analysis of English-only policies in the workplace. The EEOC, for example, "presumes, subject to rebuttal," that English-only policies "blithely enforced at all times [and] places in the work environment" violate Title VII. *Montes*, 497 F.3d at 1171 (citing 29 C.F.R. § 1606.7(a)). But, the EEOC guidelines also provide that "[a]n employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity." 29 C.F.R. § 1606.7(b); *see also Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 239 (D. Mass. 2003) (applying § 1606.7(b)); *Prado v. L. Luria & Son, Inc.*, 975 F. Supp. 1349, 1357 (S.D. Fla. 1997) (upholding English-only policy as being consistent with EEOC guidelines where employer established business necessity).[6] Given the EEOC's position, it should not be surprising that Plaintiff has failed to identify a single case in which a court upheld a Title VII claim in the face of a summary judgment motion where the language policy involved work-

---

[6]To the extent this regulation allows plaintiffs to establish a prima facie case of discrimination, a bare majority of courts have declined to defer to it. *See EEOC v. Beauty Enters., Inc.*, No. 01-CV-378, 2005 WL 2764822, at *5 (D. Conn. Oct. 25, 2005) (refusing to defer to the EEOC guidelines regarding English-only policies, noting that the Ninth Circuit and three out of five district courts also have declined to give deference to the EEOC's guidelines, and instructing the jury that plaintiff was required to establish a prima facie case of discrimination from English-only policy); *but see Montes*, 497 F.3d at 1171 (noting that the EEOC guidelines are "entitled to respect, not as interpretations of the governing law, but as an indication of what a reasonable, informed person may think about the impact of an English-only work rule on minority employees, even if we might not draw the same inference" (quoting *Maldonado*, 433 F.3d at 1306)). The Court need not enter the fray to decide the instant motion.

17

related communications by bilingual employees and the policy was found to further a legitimate business purpose.  *See Roman*, 53 F. Supp. 2d at 237 ("All decisions of which this Court is aware have held that English-only rules are not discriminatory as applied to bilingual employees where there is a legitimate business justification for implementing such a rule.").

In this case, even if the Court assumes Plaintiff has made out a prima facie case, Plaintiff's case fails because he has not offered enough evidence to dispute Defendant's legitimate, non-discriminatory reason for the English-only practice ARRA followed.[7]  To begin, the Court notes that the practice at issue was not a blanket prohibition against any non-English conversations by employees in the ARRA unit.  Instead, the undisputed evidence is that Votta, who does not speak Spanish, asked Plaintiff, who is fully bilingual, on several occasions to speak English when in hearing range of patients.  There is no evidence that Plaintiff, or any other ARRA employee, was barred from speaking Spanish during breaks or when not near patients.  In fact, Plaintiff admits that he spoke Spanish to his colleagues every day while at the ARRA, and, on occasion, was asked to help communicate with Spanish-speaking patients.  This undercuts any claim of bias against Hispanic employees.  *See Long*, 894 F. Supp. at 942 (noting that the fact that employees were encouraged to speak Spanish when necessary makes "even more

---

[7]Aside from the EEOC guidelines, Plaintiff relies on the "preliminary report" of Dr. Susan Berk-Seligson as evidence that the English-only practice at ARRA was discriminatory.  According to Dr. Berk-Seligson, an English-only policy can be humiliating and frustrating to native Spanish speakers.  Among other sources of frustration, Dr. Berk-Seligson claims that bilingual persons, such as Plaintiff, engage in what is known as "code-switching," which means that they will inevitably speak some Spanish to other Spanish-speaking individuals.  (Pl.'s Mem. Ex. 12 at 1.)  According to Dr. Berk-Seligson, "[p]rohibiting a Hispanic employee from speaking a combination of Spanish and English is in effect creating an atmosphere of inferiority, isolation and intimidation."  (*Id.*)  Whatever the merits of Dr. Berk-Seligson's theory, and the Court takes no view on this, it is enough for the Court to assume that Plaintiff has made out a prima facie case for purposes of this motion based on this report.

credible" the justification for a limited English-only rule). Moreover, there is no evidence that Votta or any Hospital supervisor or employee made any discriminatory comments, or that Votta (or any other supervisor) selectively enforced the practice of speaking English near patients, either among the employees or on the basis of any particular language. And, notably, Plaintiff was not disciplined in any way for any limited number of instances in which he spoke Spanish while on the job.

On the other hand, Defendant has offered ample evidence that demonstrates a valid business reason for the practice. First, Defendant notes, and Plaintiff does not dispute, that several patients had complained about feeling ridiculed by ARRA employees who were not speaking English in their presence. Thus, Defendant contends that the practice of requiring employees to speak English to and around patients was consistent with Defendant's goal of treating all patients with respect. Second, Defendant notes that it was far easier for Votta and other supervisors in the ARRA, who did not speak Spanish, to properly supervise and evaluate Plaintiff if he spoke English around and to them. Plaintiff does not contest the factual predicate for these claims; nor does he offer any evidence that Votta and other supervisors allowed other employees to speak any languages other than English under similar circumstances. Given this undisputed record, the case law supports Defendant's claim of business necessity. For example, a number of courts have upheld limited English-only policies for bilingual employees as a means of facilitating customer relations. *See, e.g.*, *Gonzalo v. All Island Transp.*, No. 04-CV-3452, 2007 WL 642959, at *2 (E.D.N.Y. Feb. 26, 2007) (noting that English-only policy in dispatch office of transport carrier was justified); *EEOC v. Sephora USA, LLC*, 419 F. Supp. 2d 408, 417 (S.D.N.Y. 2005) (holding that English-only policy of retailer was justified as a means of

improving communication with customers and noting that "promoting politeness to customers is a valid business necessity for requiring sales employees to speak English in their presence"); *Kania v. Archdiocese of Philadelphia*, 14 F. Supp. 2d 730, 736 (E.D. Pa. 1998) (finding that English-only rule was reasonably necessary to, *inter alia*, improve relations among church members).  Furthermore, courts regularly have upheld limited English-only policies for bilingual employees to promote communication among employees and supervisors.  *See, e.g.*, *Montes*, 497 F.3d at 1171 (upholding limited English-only policy where it was "undisputed that clear and precise communication between the cleaning staff and the medical staff was essential in the operating rooms" of a hospital); *Sephora*, 419 F. Supp. 2d at 415 (noting that courts have found limited English-only practices "permissible when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area"); *Roman*, 53 F. Supp. 2d at 237 ("Defendants' purported goals of avoiding or lessening interpersonal conflicts, preventing non-foreign language speaking individuals from feeling left out of conversations, and preventing non-foreign language speaking individuals from feeling that they are being talked about in a language they do not understand, are legitimate business reasons justifying [the employer's] English-only rule."); *Long*, 894 F. Supp. at 942 (finding business necessity in limited English-only rule to promote communication among employees and to ensure that the business "runs smoothly and efficiently").[8]

---

[8]Defendant's proffer of business necessity in this case finds support from the EEOC.  For example, the EEOC Compliance Manual describes situations where business necessity could justify a "certain times" English-only rule.  These situations include:  (1) "[f]or communication with customers, coworkers or supervisors who only speak English"; or (2) "[t]o enable a supervisor who only speaks English to monitor the performance of an employee whose job

Plaintiff has failed to offer evidence to rebut Defendant's proffered justification for the ARRA unit's limited English-only practice.  First, Plaintiff claims that at least half of the patients at the Hospital were Hispanic.  Defendant does not dispute this claim, and, in fact, acknowledges that there were instances where Votta asked Plaintiff to speak to some of the patients who spoke only Spanish – hardly evidence of bias by Votta.  Moreover, even Plaintiff's statistics allow for the fact that up to half the patient population spoke no Spanish, and they offer no refutation that at least some of the English-speaking patients had complained about employees who spoke a language other than English in their presence.

Second, Plaintiff relies on very limited statistics about the employees who worked for Votta to suggest she was biased against Hispanics.  Specifically, Plaintiff contends that Votta supervised approximately 16 employees when she began working in the ARRA unit.  (Pl.'s Mem. 6; Dep. of Patricia Votta ("Votta Dep.") 15.)  During her deposition, Votta recounted that eight of those employees were no longer with ARRA (Votta Dep. 17), and Plaintiff asserts that approximately six of those eight employees "were persons with identifiably Hispanic surnames" (Pl.'s Mem. 6).  From this, the Court surmises that a fact finder is to infer that Votta is hostile to Hispanics.  Yet, Plaintiff has offered no statistics about why those eight employees left, how many of the eight remaining employees were Hispanic, how many employees replaced those who had left the ARRA unit and what the ethnic/racial composition of that group was.  Moreover, Plaintiff offers no evidence about who hired those sixteen original employees, or those who replaced those who departed.  This could be highly probative, especially if it was

---

duties require communication with coworkers or customers."  EEOC Compliance Manual § 13-V(C)(1) ("Application of Title VII to English-Only Rules") (June 2006).

Votta who made both of these decisions. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire."); *Woodard v. Monticello Cent. Sch. Dist.*, No. 06-CV-13361, 2008 WL 5062125, at *14 (S.D.N.Y. Dec. 1, 2008) (noting that the conclusion that the plaintiff had failed to establish a genuine issue of material fact as to whether she was terminated due to race discrimination was strongly supported under the "same actor inference" by the fact that the plaintiff's hiring and firing was recommended by the same individual); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) (applying same actor inference in context of Title VII race discrimination claim). In short, Plaintiff has not offered any evidence that makes for a viable claim that Defendant's justifications for its limited English-only practice were a pretext for discrimination proscribed by Title VII.[9]

Plaintiff's disparate treatment claims also fails because he has not established that he suffered an adverse employment action. *See Weeks v. New York State (Div. of Parole)*, 273 F.3d

---

[9]Plaintiff also claims disparate treatment on behalf of Spanish-speaking employees, Spanish-speaking patients, and their families. (Compl. ¶ 55.) In addition to the fact that Plaintiff never moved to certify this action as a class action, these claims fail for three reasons. First, Title VII is not a viable means of redressing the potential claims of Spanish-speaking patients and their families, because Title VII is "available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers." *York v. Ass'n of Bar of New York*, No. 00-CV-5961, 2001 WL 776944, at *3 (S.D.N.Y. July 11, 2001) (quoting *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996)). Second, Plaintiff's claims on behalf of the Hospital's Spanish-speaking employees also fail because Plaintiff does not have standing to assert these claims because, as explained below, Plaintiff has not established that he suffered an adverse employment action. *See Comer v. Cisneros*, 37 F.3d 775, 787-792 (2d Cir. 1994) (holding, in context of complaint alleging Fair Housing Act discrimination, that in order to have standing, the purported class action representative must prove that he suffered a personal injury or threat of injury and that injury can fairly be traced to the action challenged). Third, the record shows that no other ARRA employee complained about the English-only practice in the unit.

76, 85 (2d Cir. 2001) (finding that "[a]n adverse employment action is a requisite of a claim

alleging disparate treatment or retaliation" (citing *McDonnell Douglas Corp.*, 411 U.S. at 802)),

*abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002);

*Bazile v. City of New York*, 215 F. Supp. 2d 354, 371 (S.D.N.Y. 2002) (same).  An adverse

employment action is a "'materially adverse change in the terms and conditions of

employment.'"  *Weeks*, 273 F.3d at 85 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d

636, 640 (2d Cir. 2000)).  "To be materially adverse, a change in working conditions must be

more disruptive than a mere inconvenience or an alteration of job responsibilities.  Such a

change might be indicated by a termination of employment, a demotion evidenced by a decrease

in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or other indices . . . unique to a particular situation."  *Weeks*, 273 F.3d

at 85 (internal citations and quotation marks omitted); *see also Reddy*, 2008 WL 2811828, at *8

n.127 (noting that adverse impact analysis in disparate treatment context is limited to "the terms

and conditions of employment").[10]

    A nominally lateral transfer, even without any loss in salary, can constitute an adverse

employment action under Title VII.  *See De la Cruz v. New York City Human Res. Admin. Dep't

of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (finding adverse action where the plaintiff

contended that his employer moved him from an "elite" division, which provided prestige and

opportunity for advancement, to a less prestigious unit with little opportunity for professional

---

    [10]As noted below, it bears emphasis that the analysis of adverse employment actions
involving disparate treatment claims is different than that involving retaliation claims.  *See
Gentile v. Potter*, 509 F. Supp. 2d 221, 238-39 (E.D.N.Y. 2007) (noting that adverse employment
actions in the context of a retaliation claim cover a broader range of conduct than in the
discrimination context).

growth); *Rodriguez v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 365-66 (2d Cir. 1980) (reversing dismissal of Title VII action by junior high school art teacher who was involuntarily transferred to an elementary school in the same school system with no change in salary, seniority, or work load and noting that the transfer was "in effect, a demotion that would constitute a serious professional setback and stigma to her career").  The key in this analysis is that the "plaintiff must show that the transfer created a materially significant disadvantage." *Galabya*, 202 F.3d at 641 (internal quotation marks omitted); *see also Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("[B]ecause job discrimination can take many forms, courts are not limited as to the job conditions that may be considered in determining whether a particular employment action is materially adverse . . . . The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion." (internal citations and quotation marks omitted)).

Reviewing the facts in the light most favorable to Plaintiff, the Court finds that he has not proved that he suffered any adverse employment action necessary to establish a prima facie claim of disparate treatment.  Although Plaintiff alleges in his Complaint that he was denied promotions due to his transfer out of the ARRA unit (Compl. ¶¶ 41-42), the facts, as admitted by Plaintiff, squarely contradict this assertion.  Specifically, Plaintiff alleges that as a result of his voluntary transfer out of the ARRA unit, he was limited in his ability to be promoted for one and a half years.  (Compl. ¶ 42.)  Yet, Plaintiff stated in his deposition and in his admissions that he was given a significant promotion to the position of Patient Financial Advisor, with a seventeen percent increase in salary, a mere three months after leaving the ARRA unit.  (Pacheco Dep. 223-25; Pl.'s Resp. to Def.'s Req. for Admis. ("Pl.'s Admis.") Nos. 11-12; Def.'s 56.1 ¶ 23.)

24

Plaintiff thereafter (in 2002) received another promotion to the position of Patient Financial Counselor, International Services, and, as of September 2004, earned close to double what he was earning while he was employed in the ARRA unit.  (Pacheco Dep. 25, 47-48; Pl.'s Admis. Nos. 13-14; Def.'s 56.1 ¶ 24.)

Although Plaintiff voluntarily chose to transfer out of the ARRA unit, even if the Court treats Plaintiff's move back to the AIM clinic as an involuntary transfer, there is nothing in the record to suggest that this transfer was tantamount to a demotion.  Plaintiff's transfer out of the ARRA unit resulted in no change in pay, benefits, or bargaining unit seniority.  Furthermore, at oral argument, counsel for Plaintiff acknowledged that there is nothing in the record to support the notion that the promotion path in the ARRA unit was somehow better than what was available by transferring back to the AIM clinic or that Plaintiff lost out on any specific job opportunity as a result of this transfer.  (Tr. of Oral Argument held Dec. 2, 2005 ("Tr.") 13.) Indeed, the undisputed record demonstrates just the opposite; after rejoining the AIM clinic Plaintiff was rapidly promoted to jobs with increased responsibility and higher salary.  Thus, while lateral transfers can, in certain circumstances, be tantamount to a demotion, and therefore, an adverse employment action, what happened here was a lateral transfer that did not disrupt Plaintiff's career path in any material way.  *See Watson*, 578 F. Supp. 2d at 563 ("A transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively."); *Pimentel v. City of New York*, No. 00-CV-326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002) (noting that there is no adverse employment action when the transferred employee has "the same opportunities for promotion" (internal quotation marks omitted)).  The

25

fact that Plaintiff may not have wanted to transfer does not alter the analysis.  *See Garber v. New York City Police Dep't*, No. 95-CV-2516, 1997 WL 525396, at *7 (S.D.N.Y. Aug. 22, 1997) ("Plaintiff does not dispute Defendants' representation that, by any objective standard, Plaintiff's transfer to the NYPD's Recruitment Section was a purely lateral transfer.  Rather, Plaintiff relies solely on his subjective feelings about the transfer in arguing that it was an adverse employment action.  Plaintiff's dissatisfaction with the transfer, standing alone, does not support his claim of an adverse employment action." (footnote omitted)).  In short, Plaintiff has failed to produce evidence that the transfer he requested was to a position materially less prestigious, less suited to his skills, or less conducive to career advancement.  To conclude otherwise, "[the Court] would have to do more than read [the facts] in a light favorable to [Plaintiff's] claim; [the Court] would in effect have to invent that portion of [his] complaint explaining why those actions are adverse to [him]."  *Weeks*, 273 F.3d at 87.

The only other possible adverse employment actions involve not the transfer, but the change of Plaintiff's work hours, a one-time-only request that Plaintiff complete a work assignment that would normally require two and a half hours to complete only fifteen minutes before he was due to leave for the day, and an unfavorable comparison of his work to that of a more senior employee.  (Compl. ¶¶ 1, 21-26, 28-29.)  Reviewing the facts in the light most favorable to Plaintiff, however, these allegations also fail.[11]  First, despite the fact that Plaintiff's job description included flexible hours and days and that the ARRA was open and staffed seven days a week (Pacheco Dep. 232-41; Votta Aff. ¶ 11, Exs. B, C; Def.'s 56.1 ¶¶ 29-31), Plaintiff

---

[11]These claims also make up Plaintiff's cause of action for retaliation and are discussed below.

was never assigned to work on a weekend (Pl.'s Admis. No. 9; Def.'s 56.1 ¶ 32).  Second, the

slight change in Plaintiff's work schedule, by itself, did not amount to an adverse employment

action.  *See Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008)

(finding no adverse employment action where there were minor changes to plaintiff's work

schedule and weekends off); *Antonmarchi v. Consol. Edison Co.*, No. 03-CV-7735, 2008 WL

4444609, at *14 (S.D.N.Y. Sept. 29, 2008) ("Unfavorable hours do not constitute an adverse

employment action for the purposes of Title VII."); *Constance v. Pepsi Bottling Co.*, No. 03-CV-

5009, 2007 WL 2460688, at *18 (E.D.N.Y. Aug. 24, 2007) ("[P]laintiff's complaints that he was

required to travel and had irregular shifts requiring him to work at night and on occasional

weekends amounts to 'mere inconveniences' rather than adverse actions." (quoting *Galabya*, 202

F.3d at 640)); *Ruhling v. Tribune Co.*, No. 04-CV-2430, 2007 WL 28283, at *10 (E.D.N.Y. Jan.

3, 2007) ("[I]t should be noted that a schedule change standing alone does not constitute an

adverse employment action."); *Rivera v. Potter*, No. 03-CV-1991, 2005 WL 236490, at *6

(S.D.N.Y. Jan. 31, 2005) (noting that an unwanted schedule change is not an adverse

employment action); *accord Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir.

2001) (finding that a reassignment from a day shift to a night shift is not a change in duties,

compensation or benefits constituting an adverse employment action); *Grube v. Lau Indus., Inc.*,

257 F.3d 723, 728 (7th Cir. 2001) (holding that an employer's decision to move an employee

from a first shift to a second shift does not, without more, rise to the level of an adverse

employment action in case of employment discrimination).

      Third, the allegedly unfavorable criticism and the one request to complete an assignment

shortly before the end of the work-day also fall short because they were not "more disruptive

than a mere inconvenience or an alteration of job responsibilities." *Weeks*, 273 F.3d at 85

(internal quotation marks omitted).  "It hardly needs saying that a criticism of an employee

(which is part of training and necessary to allow employees to develop, improve and avoid

discipline) is not an adverse employment action." *Id.* at 86; *see also Young v. Pitney Bowes,*

*Inc.*, No. 03-CV-1161, 2006 WL 726685, at *27 (D. Conn. Mar. 21, 2006) ("'[C]riticism of an

employee [alone] . . . is not an adverse employment action.'" (quoting *Weeks*, 273 F.3d at 86));

*Chamberlin v. Principi*, No. 02-CV-8357, 2005 WL 1963942, at *5 (S.D.N.Y. Aug. 16, 2005)

(finding that plaintiff had not shown an adverse employment action where there was no evidence

that "his career opportunities within or without [his place of employment] were damaged as a

result of [a] lowered [performance] evaluation"); *Weisman v. New York City Dep't of Educ.*, No.

03-CV-9299, 2005 WL 1813030, at *6 (S.D.N.Y. Aug. 1, 2005) ("[A]n unsatisfactory rating

itself may not constitute an adverse employment action."); *Knight v. City of New York*, 303 F.

Supp. 2d 485, 497 (S.D.N.Y. 2004) (noting that disciplinary memoranda and evaluations are

adverse employment actions only if they affect terms of employment such as promotions, wages,

or terms).  And, there is nothing about the one rushed work assignment, or any of the "criticism,"

that resulted in any disciplinary action against Plaintiff, or otherwise stunted his professional

progress, responsibilities, or compensation.  In short, Plaintiff has not offered any evidence that

these actions resulted in any material change to the conditions to his employment – salary, job

responsibilities, or promotion opportunities.  If anything, the record demonstrates that the

Hospital materially *improved* the conditions of Plaintiff's employment even after he and Votta

clashed over the language practices in the ARRA unit.  Therefore, the Court grants Defendant's

motion for summary judgment on Plaintiff's disparate treatment claim.

2.  Disparate Impact

Plaintiff also claims that the limited English-only practices at the ARRA unit were unlawful because they imposed a disparate impact on Spanish-speaking employees such as himself.  Under the disparate impact theory, Title VII prohibits employment practices that are facially neutral, but fall more harshly on one group and cannot be justified by a business necessity.  *See Hayden*, 180 F.3d at 52.  Unlike disparate treatment claims, therefore, a plaintiff need not show discriminatory intent.  *See Griggs v. Duke Power Co.*, 401 U.S. 424 432 (1971) (noting that an employer's "good intent" is irrelevant to a disparate impact claim).  Like disparate treatment claims, disparate impact claims are analyzed under a three-part burden-shifting test.  *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160-61 (2d Cir. 2001).  To establish a prima facie case of disparate impact, a plaintiff "must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two."  *Id.* at 160; *see also Malave v. Potter*, 320 F.3d 321, 325 (2d Cir. 2003) (applying same test); *Williams v. Potter*, No. 03-CV-1640, 2007 WL 247716, at *3 (D. Conn. Jan. 29, 2007) (same).  In establishing a prima facie case, the Second Circuit has held that "allegations which contend only that there is a bottom line racial imbalance in the work force are insufficient."  *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).  Instead, a disparate impact plaintiff must establish that a comparison between individuals affected and those unaffected by the questioned policy reveals "that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals."  *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (internal quotation marks omitted).  Normally, in this analysis, "statistical proof almost always occupies center

29

stage." *Robinson*, 267 F.3d at 160.  Once a plaintiff has made out a prima facie case, the burden

then shifts to the defendant to either challenge the plaintiff's statistical proof or show that there

was a business necessity for the challenged practice.  *See id.*  In the third stage, a plaintiff can

rebut a business necessity claim by showing that an alternative, non-discriminatory practice

could have also satisfied the asserted business necessity without the attendant disparate effect.

*See id.* (citing 42 U.S.C. § 2000(e)-2(k)(1)(A)(ii), (C)) (other internal citations omitted).

To make out a prima facie claim, Plaintiff cites EEOC guidelines to argue that there was

a English-only policy at the ARRA unit and that "absent a business necessity, 'English-Only'

policies in the workplace are national origin discrimination"  (Pl.'s Mem. 3.)  As it does with

respect to Plaintiff's disparate treatment claim, Defendant counters there was no "English-only"

policy in place Hospital-wide, and even if there was, such a policy does not violate Title VII (or

the NYSHRL or NYCHRL), because classification by language is not, by itself, a "suspect class"

and is insufficient to establish discriminatory intent.  (Def.'s Mem. 6-9.)  Indeed, Plaintiff has

conceded the Hospital's assertion that there was no Hospital-wide English-only policy and that

the requests for Plaintiff to speak English were limited to times when he was on-duty and/or

working near patients.  (Pacheco Dep. 78-84, 89-91, 145-46, 173-78, 283-85.)  And, Plaintiff has

not provided any statistical analysis, or any other empirical proof, that the ARRA's limited

English-only practices disproportionately affected any group, whether categorized by race,

ethnicity, or language.  In fact, the record reveals not a single complaint from any employee,

other than Plaintiff, about the English-only practice in the ARRA unit, and there is no evidence

that employees were allowed to speak other non-English languages around patients or in the

presence of ARRA's supervisors.  All of these are facts virtually fatal to any prima facie case.

*See Velasquez*, 88 F. Supp. 2d at 263 (noting that plaintiff had "not presented a scintilla of evidence that other employees were permitted to speak in languages other than English").

However, Plaintiff counters that the EEOC guidelines themselves make out a prima facie case for a disparate impact claim. The pertinent EEOC guideline provides that "[a]n employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity." 29 C.F.R. § 1606.7(b). Implicit in this guideline is that the English-only rule "satisfies an employee's burden of establishing a prima facie showing of disparate impact and advances the inquiry to the second step of the burden-shifting framework." *Sephora*, 419 F. Supp. 2d at 414. Recognizing that several courts have "rejected the guideline's approach as inconsistent with Title VII," *Gonzalo*, 2007 WL 642959, at *2, the Court nonetheless is willing to assume, without deciding and for purposes of this motion only, that Plaintiff has met his initial burden of establishing a prima facie case of disparate treatment under the EEOC guidelines. *See Gonzalo*, 2007 WL 642959, at *2 (assuming without deciding that plaintiff made a prima facie showing of disparate impact by virtue of a policy restricting "bi-lingual employees from speaking in Spanish at certain times"); *Sephora*, 419 F. Supp. 2d at 414-18 (assuming, under the EEOC guidelines, that plaintiff established a prima facie case of disparate treatment, but rejecting the claim on business necessity grounds). Thus, the Court turns to the second stage of the analysis.

At the second stage of the burden-shifting framework, Defendant has the burden to show that the policy is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(I); *see also Roman*, 53 F. Supp. 2d at 237 (listing cases holding English-only rules are not discriminatory as applied to bilingual employees when there is a

legitimate business necessity justification for the rule).  As discussed at length in connection with Plaintiff's disparate treatment claim, the Hospital has established two non-discriminatory business reasons for asking employees in the ARRA unit to speak English while at work.  First, the ARRA practice was applied to help the Hospital's patients feel comfortable and to avoid creating the impression that a patient was being spoken about or ridiculed in a foreign language. At the time Plaintiff was warned by Votta to speak English while working, he was also personally advised that the policy stemmed from the Hospital's concern that nearby patients may feel uncomfortable overhearing employee conversations in Spanish and thinking that an employee was talking about them.  (Pacheco Dep. 145-48; Def.'s 56.1 ¶ 16.)

Employers "need not demonstrate that a particular percentage of customers' opinions corroborate its business judgment that certain behavior is impolite and unhelpful.  [The courts] 'do[] not sit as a super-personnel department that reexamines an entity's business decisions.'" *Sephora*, 419 F. Supp. 2d at 417 (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)). Further, "[i]f a customer preference is sufficiently related to job performance then it qualifies as a 'business necessity.'"  *Id.* at 416 (citing *Gerdom v. Continental Airlines Inc.*, 692 F.2d 602, 609 (9th Cir. 1982)).  Here, Plaintiff has acknowledged that treating patients and co-workers with respect is a guiding principle of the Hospital, and he was so advised during his employment at the Hospital and signed documents to that effect.  (Pacheco Dep. 35-37.)  Plaintiff also does not dispute that "[c]ommunicating compassionately and effectively" with patients and co-workers was an important element of his job in the ARRA unit.  (Pacecho Dep. 41.)  Plaintiff has conceded that some of the patients he dealt with were under great personal stress, and he was not to make them, or any other patient, feel "ill at ease."  (Pacheco Dep. 44.)  Finally, Plaintiff has

admitted that the first time he was asked by Votta to speak English while working in front of patients, he was specifically told that it was due to a concern that patients may think that he was talking about them behind their backs.  (Pacheco Dep. 145-47.)  Under these circumstances, it cannot be seriously contested that Defendant has established a valid business reason to ask bilingual employees such as Plaintiff to speak English around patients.

Second, the Hospital has established that Votta asked employees to speak English when engaging in work activities so that their English-speaking supervisors could properly monitor their work.  (Def.'s Mem. 9-11;  Def.'s Reply 9-10; Votta Aff. ¶ 11.)  Plaintiff acknowledges that neither of his supervisors, Votta or Hack, understood Spanish and therefore, neither could properly supervise Plaintiff or determine if he was being appropriately trained during his probationary period if he spoke Spanish while on the job.  (Pacheco Dep. 133-137.)  As noted above, the case law supports this as an additional reason to permit a limited English-only policy. *See, e.g.*, *Montes*, 497 F.3d at 1171 (upholding limited English-only policy where it was "undisputed that clear and precise communication between the cleaning staff and the medical staff was essential in the operating rooms" of a hospital); *Sephora*, 419 F. Supp. 2d at 415 (noting that courts have found limited English-only practices "permissible when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area"); *Tran v. Standard Motor Prods., Inc.*, 10 F. Supp. 2d 1199, 1210 (D. Kan. 1998) (upholding defendants' goal of ensuring that all employees and supervisors could understand each other as a legitimate business reason for an English-only policy); *Prado*, 975 F. Supp. at 1354 (finding legitimate employer's assertion that

33

English-only policy was necessary to "ensure that management understands what is being said in order to evaluate employees in all work related communications").

Under the three-part burden-shifting test, once an employer has demonstrated a valid business necessity for a limited English-only policy, the burden of persuasion shifts back to the plaintiff to establish the availability of an alternative policy or practice that would accomplish the purported business necessity without producing the disparate effect. *See Robinson*, 267 F.3d at 161 (internal citations omitted). Here, Plaintiff has not put forth any less discriminatory alternative to the limited English-only practice that was in place at the ARRA unit, let alone one that would not produce the same disparate effect. And, when combined with the fact that Plaintiff did not produce any evidence that the limited English-only practice at issue was contested by any other Spanish-speaking employees, let alone that it disproportionately affected such employees, the Court concludes that Plaintiff has failed to carry his burden of showing disparate impact.

### 3.  Hostile Work Environment

Plaintiff alleges that Defendant's English-only policy created a hostile work environment. (Pl.'s Mem. 5.) He rests this claim on the conclusory argument that an English-only policy "can induce native speakers of Spanish to experience a work environment as hostile." (Pl.'s Mem. 5.)

"'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993)).  To prevail on a hostile work environment claim under Title VII, a plaintiff must show

"misconduct" that is "severe or pervasive enough to create an objectively hostile or abusive work

environment, and the victim must also subjectively perceive that environment to be abusive."

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks omitted).[12]  "As a

general rule, incidents must be more than episodic; they must be sufficiently continuous and

concerted in order to be deemed pervasive."  *Id.* (internal quotation marks omitted).  In

addressing whether Plaintiff has substantiated a hostile work environment claim, courts must

look to the "totality of the circumstances," *id.* (internal citations and quotation marks omitted),

and consider "'the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'"  *Id.* (quoting *Harri*s, 510 U.S. at 23).

"While the standard for establishing a hostile work environment is high," the Second

Circuit has "repeatedly cautioned against setting the bar too high, noting that while a mild,

isolated incident does not make a work environment hostile, the test is whether the harassment is

of such quality or quantity that a reasonable employee would find the conditions of her

employment *altered for the worse*."  *Id.* (internal quotation marks omitted); *see also Feingold v.

New York*, 366 F.3d 138, 150 (2d Cir. 2004) (applying standard to find that intimidation,

ridicule, and insults borne by Plaintiff because he was Jewish could establish pervasive

discrimination); *Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, __ F. Supp. 2d __, No.

07-CV-6418, 2008 WL 4865036, at *12 (S.D.N.Y. Nov. 5, 2008) (noting that while teasing and

_____

[12]The legal standard applied to a hostile work environment claim under the NYSHRL and
NYCHRL is the same as that applied under Title VII.  *See Dawson*, 398 F.3d at 217; *Forrest v.
Jewish Guild for the Blind*, 819 N.E.2d 998, 1006 n.3 (N.Y. 2004).

35

offhand comments might not be severe or pervasive enough for a claim of discrimination, an allegation of assault was serious enough that a single instance could be enough for a reasonable employee to find the conditions of her employment '*altered for the worse*' (emphasis in original)).  Under this test "[t]he environment need not be 'unendurable' or 'intolerable'. . . . [n]or must the victim's psychological well-being be damaged.  In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Terry*, 336 F.3d at 148 (internal citations and quotation marks omitted); *see also Lopes v. Caffe Centrale LLC*, 548 F. Supp. 2d 47, 53 (S.D.N.Y. 2008) (same); *Morel v. ABM Co.*, No. 02-CV-3564, 2006 WL 3771006, at *8 (S.D.N.Y. Dec. 19, 2006) (same).  On the other hand, courts repeatedly have commented that Title VII does not create a "general civility code," *Oncale*, 523 U.S. at 81, and "not all workplace conduct that may be described as harassment affects . . . employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted).

Plaintiff asserts that the English-only practice was especially burdensome for employees like him, "who can not avoid the use of Spanish in their interaction with other employees." (Pl.'s Mem. 5.)  The alleged difficulty Plaintiff had in not lapsing into Spanish is belied by Plaintiff's testimony that he is fully bilingual in English and Spanish.  Plaintiff's allegation of a hostile work environment is further undercut by his acknowledgment that no disparaging remarks of any sort were directed at his national origin by any Hospital representative while he was employed in the ARRA unit.  *See Brewster*, 447 F. Supp. 2d at 351 (holding that language policy was only actionable because it was accompanied by evidence of ethnically-hostile

statements to the plaintiff).  In addition, no other ARRA employees, some of whom have been

Spanish-speakers, complained about the limited English-only practice, (Def.'s 56.1 ¶ 38;

Pacheco Dep. 189-90), and in fact, some stated that they thought it was a good idea (Pacheco

Dep. 141-43).

     Plaintiff also relies on the views of the aforementioned Dr. Susan Berk-Seligson, who

holds a Ph.D. in linguistics, to explain how an English-only policy might hurt Plaintiff's ability

to perform his job duties.[13]  (Pl.'s Mem. 5.)  Even if Dr. Berk-Seligson's report were admissible

---

     [13]The admissibility of the Berk-Seligson report, (Pl.'s Mem., Ex. 12), is problematic as it was submitted well after an extended discovery deadline and after Defendant filed its Motion for Summary Judgment.  Plaintiff also failed to disclose the report in response to two sets of discovery demands, (Dec. 5, 2003 and July 8, 2004), in contravention of Federal Rule of Civil Procedure 26(a).  This is exactly the type of scenario that could warrant preclusion under Federal Rule of Civil Procedure 37(c)(1).

     Despite the fact that Plaintiff's request for a discovery extension, which was granted, included a statement that Plaintiff was contemplating an expert report to respond to Defendant's dispositive motions, Plaintiff incredulously asserts that he did not previously disclose the report because he "had no way to determine that the report would be useful in advancing his cause." (Pl.'s Mem. 4 n.1.)  By the report's own admission, Dr. Berk-Seligson did not interview Plaintiff until approximately a month after Defendant submitted its Motion for Summary Judgment. Further, there is reason to believe that Plaintiff delayed the submission of his response to Defendant's motion, after seeking and obtaining an extension from the Court (Dkt. No. 39), until he purportedly first received the draft expert report.

     The Court recognizes that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy that should be applied with discretion and caution.  *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  Here, Plaintiff has provided no reasonable justification for his failure to disclose the expert report before Defendant filed its summary judgment motion. Moreover, the delay of submitting the report until well after Defendant submitted its Motion for Summary Judgment potentially prejudiced Defendant.  In particular, the tardy submission of the expert report led Defendant to base its motion "on what [it] believed was the strength of the plaintiff's case at the close of discovery," *id.* at 607, and therefore, Defendant could not address any of the points raised in the expert report in its motion.

     Although Plaintiff has provided no justification for his failure to timely disclose the expert report, the Court finds that due to the expert report's limited value and the fact that Defendant had an opportunity to respond to the expert report in its reply brief, (Def.'s Reply 10-13), the tardy disclosure of the expert report was relatively harmless and therefore preclusion is not necessary.  *See* Fed. R. Civ. P. 37(c)(1) (stating that a party will not be allowed to use

under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), her largely abstract report

adds nothing in the way of evidentiary support for the claim that Plaintiff suffered from an

actionable hostile work environment.  *See CL-Alexanders Laing & Cruickshank v. Goldfeld*, 739

F. Supp. 158, 164 (S.D.N.Y. 1990) ("[W]hile expert opinion may be helpful, summary judgment

can be defeated only by the allegation of specific facts.  A particular set of facts 'cannot be

established by mere speculation or idiosyncratic opinion, even if th[e] opinion [about the facts] is

held by one who qualifies as an expert." (quoting *In re Agent Orange Prods. Liab. Litig.*, 818

F.2d 187, 193 (2d Cir. 1987))).  In fact, Dr. Berk-Seligson's conclusion borders on being an

improperly legal one that Plaintiff was subject to an unlawfully hostile work environment based

on "his Hispanic ethnicity."  *See Densberger v. United Tech. Corp.*, 297 F.3d 66, 74 (2d Cir.

2002) ("It is a well-established rule in this Circuit that experts are not permitted to present

testimony in the form of legal conclusions." (quoting *United States v. Articles of Banned

Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994))).

It bears noting that Dr. Berk-Seligson reached her conclusion without interviewing Votta

or any other Hospital employees (other than Plaintiff) to account for the rationale for the

language practice in the ARRA, or what effect the practice had on other Spanish-speaking and/or

bilingual employees.  Indeed, eleven of the thirteen pages of the expert report reflect upon

academic research and theories of "code switching" (the use of more than one language in the

course of a single communication) leaving only two pages to facts arguably involving Plaintiff.

Taken to its logical limit, the expert report is a broad critique of any language restrictions in the

---

information it failed to provide as required by Rule 26(a) unless the failure was "substantially
justified" or "harmless").

workplace on the premise that many Spanish-speaking people will invariably and inadvertently sprinkle Spanish words when having conversations in English.  Of course, the record is barren of any claim that Plaintiff was warned against "code switching."  On the contrary, Plaintiff was asked not to engage in work-related conversations in Spanish for the above-described business reasons, and he offers not a single example to the contrary.  Thus, whatever difficulties Dr. Berk-Seligson believes that some bilingual persons may have in avoiding code switching, difficulties, again, that the Court is willing to accept for purposes of this motion, the report does not establish that Plaintiff has made out a claim that he was subject to a hostile work environment because of his ethnicity, race, or even the fact that Spanish is his native language.[14]  Thus, the Court finds that Plaintiff has failed to raise a genuine issue of material fact that the conditions of Plaintiff's employment were sufficiently severe or pervasive to create an objectively hostile or abusive work environment.

---

[14]The Court is aware of two reported cases in which Dr. Berk-Seligson's opinions regarding code-switching were proffered in support of Title VII claims involving English-only policies.  In *Premier Operator Services*, the court considered Dr. Berk-Seligson's expert opinion, along with a plethora of other evidence, to find that a blanket English-only policy violated Title VII.  *See* 113 F. Supp. 2d at 1069-72.  Specifically, in *Premier Operator Services*, the court found that the defendant had discriminated against a class of plaintiffs where (i) the English-only policy applied to casual conversations between employees during lunch, (ii) the employees faced termination even for inadvertent use of Spanish, (iii) Hispanic employees were terminated and replaced by non-Hispanic employees, (iv) racially offensive comments were made to the Spanish-speaking employees (where some employers referred to plaintiffs as "wetbacks"), and (v) the employer failed to demonstrate the business necessity for the policy.  *See id.* at 1070-73. None of these critical facts, which had nothing to do with Dr. Berk-Seligson's expert opinion, exists in this case.

In *Sephora*, Judge Buchwald rejected Dr. Berk-Seligson's views about code-switching. 419 F. Supp. 2d at 418.  Aside from labeling Dr. Berk-Seligson's views as "extreme," Judge Buchwald noted that her conclusions were inconsistent with EEOC guidelines, which permit certain English-only policies justified by business necessity.  *See id.* at 418.  Moreover, similar to this case, Judge Buchwald observed that the English-only policy in *Sephora* did not implicate "instances of reversion to one's native tongue for a single word or phrase."  *Id.*

39

### 4.  Retaliation

Plaintiff also claims that the Hospital retaliated against him for opposing the Hospital's discriminatory practices and for exercising his right to file a charge against the Hospital with the EEOC.  Plaintiff describes the retaliatory acts as consisting of changing his work schedule and duties, requests from his supervisor that he complete a work assignment that would normally require two and a half hours to complete only fifteen minutes before he was due to leave for the day, and his supervisor's unfavorable comparison of his work to that of a more senior employee.[15]  (Compl. ¶¶ 1, 21-26, 28-29.)  Although the Complaint does not explicitly state that Plaintiff's transfer back to the AIM clinic was retaliation, the Court will assume that this transfer also allegedly constitutes retaliation.[16]

To establish a prima facie retaliation claim, a plaintiff must show that:  "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *see also Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008) (applying same elements); *Middleton v. Metro. Coll. of New York*, 545 F. Supp. 2d 369, 373 (S.D.N.Y. 2008) (same).  This claim is also governed by the *McDonnell Douglas* burden-shifting framework.  *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d

---

[15]These allegations of retaliation are also addressed in the disparate treatment section above.  *See*, *supra*, Section II(B)(1).

[16]To the extent Plaintiff claims that he was denied any promotions as retaliation for his complaints about the limited English-only practices of the ARRA, the evidence conclusively shows that Plaintiff was promoted within three months after his transfer out of the ARRA. (Pacheco Dep. 214-15, 223-25.)

1033, 1038-39 (2d Cir. 1993) (describing burdens of proof in retaliation claims brought under Title VII).[17]

The first two elements of Plaintiff's retaliation claim are supported by the record in this case. To constitute a protected activity, Plaintiff need not establish that the Hospital's English-only policy actually violated Title VII, but only that Plaintiff had a good faith, reasonable belief that it did. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII. However, the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal citations and quotation marks omitted)). Here, there is sufficient evidence that Plaintiff complained in good faith about the limited English-only practice in the ARRA and that Defendant was aware of his complaints.

It is on the final two elements that Plaintiff's case falls short. To begin, Plaintiff fails to establish that the retaliation from Defendant involved an adverse employment action. The Supreme Court has held that "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *White*, 548 U.S. at 64. "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. This means

---

[17]Again, the standard of review of Plaintiff's Title VII retaliation claim is the same as his state and city claims. *See Middleton*, 545 F. Supp. 2d at 373 ("The analysis of a retaliation claim under NYSHRL and NYCHRL is identical to that under Title VII . . . ."); *Hinton v. City Coll. of New York*, No. 05-CV-8951, 2008 WL 591802, at *24 (S.D.N.Y. Feb. 29, 2008) ("The elements necessary to establish a claim under Title VII's retaliatory provisions are consonant with the elements necessary to establish a claim under the [NYSHRL] and [the NYCHRL].").

that in a retaliation case, the "plaintiff must show that a reasonable employee would have found

the challenged action materially adverse, which in this context means it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68

(internal citations and quotation marks omitted).  The Supreme Court has emphasized that the

adverse employment action must be material, "because . . . it is important to separate significant

from trivial harms."  *Id.*  Similarly, the Supreme Court has highlighted that the alleged adverse

employment action must be viewed from the perspective of the reasonable employee, "because

[Title VII's] standard for judging harm must be objective" to avoid "the uncertainties and unfair

discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective

feelings."  *Id.* at 68-69.

Applying the Supreme Court's standard of review to this case, the Court finds that

Plaintiff has not made out a triable case for retaliation.  First, Plaintiff's job, after his transfer

back to the AIM clinic, was not shown by any evidence to be less desirable or disadvantageous

than his prior job in the ARRA unit.  All of the evidence conclusively demonstrates that

Plaintiff's transfer was voluntary and that he suffered no adverse consequences, but instead was

promoted twice and is making double what he made when he left the ARRA unit – hardly a set

of circumstances that would deter the reasonable employee from complaining about an

employer's employment practices.

The other retaliatory acts complained of by Plaintiff are trivial and cannot be considered

reasonably likely to deter a person from engaging in protected activity.  For example, Plaintiff's

claim regarding the shift in his work hours fails to withstand even moderate scrutiny.  Plaintiff's

work-shift hours never departed from the flexible hours described in Plaintiff's ARRA job

42

description; nor were they out of step with what other employees with similar seniority were assigned.  (Pacheco Dep. 226-42; Def.'s 56.1 ¶¶ 29, 31; Votta Aff. ¶¶ 12-13.)  Although Plaintiff's work-shift start and end times varied by, at most, an hour and a half, his total shift time of eight hours never altered.  Moreover, it is clear that his hours shifted throughout his brief tenure in the ARRA unit, including before he made any complaints about the language practice, thus undercutting any causal connection between Plaintiff's complaints and his work hours. (Pacheco Dep. 228-31.)  In fact, these minor changes to Plaintiff's schedule were no different from the shift changes his similarly situated co-workers received.  (Pacheco Dep. 235-42.) Finally, Plaintiff has failed to specify how these minor changes to his schedule, to which all ARRA employees were subject, affected in any way his family responsibilities.

The Court recognizes that in *White*, the Supreme Court noted that a change in a work schedule could be material to "a young mother with school age children."  548 U.S. at 69. Indeed, other courts have so found in similar circumstances.  *See, e.g.*, *Cruz v. Liberatore*, No. 04-CV-9808, 2008 WL 4649142, at *13 (S.D.N.Y. Oct. 14, 2008) (noting that change in plaintiff's work schedule from a regular 9:00 a.m. to 5:00 p.m. shift to weekend and "around the clock" shifts arguably affected plaintiff's "ability to visit and spend time with his son, especially during weekends").  Here, however, Plaintiff has not demonstrated how the shift in his schedule, by at most 90 minutes during the work week, affected his family responsibilities, and therefore, was anything more than an inconvenience.  Thus, there is insufficient evidence for a fact finder to conclude that a reasonable employee in the ARRA would be deterred by these minimal adjustments to his daily work shift.  *See Cruz*, 2008 WL 4649142, at *12 ("[W]ere [Plaintiff's] retaliation claim predicated solely on his change of schedule, he would face a difficult, if not

Sisyphean, task."); *Antonmarchi*, 2008 WL 4444609, at *14 (finding that plaintiff's claim that

the defendant retaliated against him by forcing him to work a permanent night shift did not

constitute an adverse employment action where the plaintiff proffered no evidence that this

"created a significant disadvantage in working conditions other than [the plaintiff's]

dissatisfaction").

Plaintiff's claim that he was told by Votta that she intended to assign him work on the

weekends also fails.  In fact, Plaintiff was never assigned to work on a weekend, even though

other ARRA employees were often required to work weekend shifts (Votta Aff. ¶ 13), and

Plaintiff acknowledged that the ARRA unit was staffed seven days a week (Pacheco Dep. 88,

226).  Taking Plaintiff's claim to be true, that he was told he would need to work weekend shifts

in the future, Plaintiff was treated no differently than other ARRA employees and, therefore, it is

unreasonable for someone in Plaintiff's position to treat his supervisor's statement as an

actionable threat that would likely deter a reasonable employee from engaging in protected

activity.

Plaintiff's claim that he was retaliated against by receiving an assignment that would

normally take two and a half hours only fifteen minutes before he was due to leave for the day

was a minor and isolated event and does not constitute an act that would reasonably likely deter

a person from engaging in a protected activity.  *See White*, 548 U.S. at 68 (noting that it is

important to separate "significant from trivial harms" and that "normal [] petty slights" and

"minor annoyances" will not "deter victims of discrimination from complaining to the EEOC");

*Gamble v. Chertoff*, No. 04-CV-9410, 2006 WL 3794290, at *8 (S.D.N.Y. Dec. 27, 2006)

(holding that an instruction to switch cubicles had only a "trivial effect" on the plaintiff, and "[a]

44

jury could not reasonably conclude that [it] . . . would have dissuaded a reasonable employee from pursuing her discrimination claims").  Similarly, Plaintiff's supervisor's unfavorable comparison of his work to that of a more senior employee is not actionable as retaliation because Plaintiff provides the Court with no reason to believe that the criticism was unwarranted or that the criticism had any tangible job consequences.  *See Carmellino v. District 20 of New York City Dep't of Educ.*, No. 03-CV-5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept. 6, 2006) (holding that negative evaluations are not actionable, especially where there is no evidence that "any negative consequences resulted from those evaluations").  Constructive criticism of employees is a necessary part of the employee-supervisor relationship and broad, unsubstantiated claims that an employee was criticized by a supervisor, without more, cannot constitute an act that would reasonably deter a person from engaging in protected activity.  *See Weeks*, 273 F.3d at 86 ("[C]riticism of an employee . . . is not an adverse employment action." (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442-43 (7th Cir. 1996))).  Therefore, Plaintiff has failed to state a claim for retaliation.  Accordingly, the Court grants Defendant's Motion for Summary Judgment with respect to this claim.

C.  Title VI and Section 1981 Claims

Plaintiff argues that the ARRA's limited English-only practices, "intentionally discriminate [against] persons of Hispanic national origin and other non white-Anglo employees" in violation of Title VI, 42 U.S.C. § 2000d.  (Compl. ¶¶ 58-59.)  Plaintiff also alleges that the Hospital intentionally discriminated against Plaintiff and thus, "by its actions, and failure to act, has violated Plaintiff's rights" in violation of 42 U.S.C. § 1981 ("Section 1981").  (Compl. ¶¶ 60-61.)

Allegations of employment discrimination under Title VI and Section 1981 are analyzed

under the same three-part burden-shifting framework of *McDonnell Douglas* as Title VII claims.

*See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (deciding that burden-shifting

scheme developed under Title VII "should apply to claims of racial discrimination under

§ 1981"), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-

166, 105 Stat. 1074; *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 405 (S.D.N.Y. 2006) (same);

*Solomon v. Uniondale Union Free Sch. Dist.*, No. 03-CV-2415, 2007 WL 608137, at *3

(E.D.N.Y. Feb. 16, 2007) (noting that Title VII burden-shifting framework applies to Title VI

cases); *McKie v. New York Univ.*, No. 94-CV-8610, 2000 WL 1521200, at *3 n.1 (S.D.N.Y. Oct.

13, 2000) (same).  Accordingly, Plaintiff's inability to establish a triable case under Title VII is

equally fatal to his claims alleged under Title VI and Section 1981.[18]

### III.  Conclusion

For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted in

its entirety.  The Clerk of the Court is respectfully requested to terminate the motion (Dkt. No.

33), enter judgment for Defendant, and close the case.


SO ORDERED.

Dated:      January 7, 2009
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[18]As noted several times, Plaintiff's state law claims are analyzed under the same
framework as his Title VII claims, and, therefore, fail as well.

46

Service List (By ECF):

Aaron David Frishberg, Esq.
Stevens, Hinds, & White, P.C.
116 West 111th St.
New York, New York 10026
*Counsel for Plaintiff*

James Stuart Frank, Esq.
David Ellis Prager, Esq.
Sills Cummis Epstein & Gross, P.C.
30 Rockefeller Plaza, 27th Floor
New York, New York 10112
*Counsel for Defendant*